IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| **STATE OF OKLAHOMA**, <br><br>**JOHN M. O'CONNOR**, in his official capacity as Attorney General of Oklahoma, and <br><br>**STEVE KUNZWEILER**, in his official capacity as District Attorney for District 14 of Oklahoma (Tulsa County), <br>         *Plaintiffs*, <br><br>v. <br><br>**HERIBERTO TELLEZ**, in both his official capacity as Regional Director of the South Central Region of the Federal Bureau of Prisons, and his individual capacity, <br><br>**COLETTE S. PETERS**, in both her official capacity as Director of the Federal Bureau of Prisons, and her individual capacity, <br><br>**S.R. GRANT**, in both his official capacity as Acting Complex Warden of FCC Pollock, and his individual capacity, and <br><br>**FEDERAL BUREAU OF PRISONS**, <br>         *Defendants*. | Civil Action No: 7:22-cv-00108-O |

**SUPPLEMENTAL BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING
ORDER/PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**I. Background and statutory text** ................................................................................................ 1

**II. The "public interest" has a defined legal meaning: it favors timely administration of a properly issued sentence of death to a convicted murderer.** ...................................................... 3

    *A.  The public interest in capital punishment is well-established.* ......................................... 3

    *B.  More broadly, the public interest in punishment of* **all** *crimes is also well-established.* ................................................................................................. 6

    *C.  The statutory scheme was designed to facilitate transfers, not thwart them.* ................... 7

    *D.  Contradicting the plain meaning of the statute cannot be rational or connected to the statutory scheme.* ................................................................................................................ 9

**III. The term "prior to his release" is only a description of when the statute applies, not a power to frustrate or deny transfers commanded by the statute.** .......................................... 10

# **TABLE OF AUTHORITIES**

**Cases**

*Alabama v. Bozeman*,
    533 U.S. 146 (2001) ............................................................................................................. 2

*Bozza v. United States*,
    330 U.S. 160 (1947) ............................................................................................................. 8

*Calderon v. Thompson*,
    523 U.S. 538 (1998) ............................................................................................................. 7

*Calogero v. Shows, Cali & Walsh L.L.P.*,
    970 F.3d 576 (5th Cir. 2020) ............................................................................................. 13

*Djie v. Garland*,
    39 F.4th 280 (5th Cir. 2022) .............................................................................................. 17

*Draughon v. Dretke*,
    No. 02CV1679, 2005 WL 3591008 (S.D. Tex. Dec. 30, 2005) .......................................... 6

*Duncan v. Walker*,
    533 U.S. 167 (2001) ........................................................................................................... 15

*Easom v. US Well Servs., Inc.*,
    37 F.4th 238 (5th Cir. 2022) ................................................................................................ 4

*Engle v. Isaac*,
    456 U.S. 107 (2022) ........................................................................................................... 11

*Env't Integrity Project v. U.S. Env't Prot. Agency*,
    969 F.3d 529 (5th Cir. 2020) ............................................................................................. 16

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012) ........................................................................................................ 4, 5

*Garrett v. United States*,
    471 U.S. 773 (1985) ............................................................................................................. 8

*Gomez v. Fierro*,
    519 U.S. 918 (1996) ............................................................................................................. 6

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ......................................................................................................... 2, 10

*Jean v. Gonzales*,
    452 F.3d 392 (5th Cir. 2006) ............................................................................................... 3

*Knapp v. U.S. Dep't. of Agric.*,
    796 F.3d 445 (5th Cir. 2015) ......................................................................................... 2, 10

*Llerena v. United States*,
    508 F.2d 78 (5th Cir. 1975) ................................................................................................. 8

*Martel v. Clair*,
    565 U.S. 648 (2012) ............................................................................................................. 5

*Ochoa v. Collier*,
   802 F. App'x 101 (5th Cir. 2020) ................................................................................................5

*Perez Pimentel v. Mukasey*,
   530 F.3d 321 (5th Cir. 2008) ....................................................................................................11

*Ponzi v. Fessenden*,
   258 U.S. 254 (1922) ..................................................................................................................12

*Ramirez v. Collier*,
   142 S. Ct. 1264 (2022) ................................................................................................................6

*Reno v. Koray*,
   515 U.S. 50 (1995) ....................................................................................................................16

*Rhoades v. Reinke*,
   830 F. Supp. 2d 1046 (D. Idaho 2011) ........................................................................................6

*Shinn v. Ramirez*,
   142 S. Ct. 1718 (2022) ..............................................................................................................11

*Thompson v. Goetzmann*,
   337 F.3d 489 (5th Cir. 2003) ....................................................................................................16

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ....................................................................................................................14

*United States v. Olarte-Morales*,
   992 F.2d 1223 (10th Cir. 1993) ..................................................................................................8

*United States v. Palomares*,
   52 F.4th 640 (5th Cir. 2022) ......................................................................................................4

*United States v. Salinas*,
   693 F.2d 348 (5th Cir. 1982) ......................................................................................................8

*United States v. Scott*,
   437 U.S. 82 (1978) ......................................................................................................................8

*United States v. Vialva*,
   976 F.3d 458 (5th Cir. 2020) ......................................................................................................5

*Veasey v. Abbott*,
   870 F.3d 387 (5th Cir. 2017) ......................................................................................................9

*Williams v. Lakeview Loan Servicing LLC*,
   509 F. Supp. 3d 676 (S.D. Tex. 2020) ......................................................................................16

*Yates v. United States*,
   574 U.S. 528 (2015) .............................................................................................................4, 10

**Statutes**

18 U.S.C. § 3622 ................................................................................................................................2

18 U.S.C. § 3623 ..........................................................................................................1, 2, 8, 9, 10, 11, 12

**Other Authorities**

Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (West 2012)............13

*Interest, Legal Definition*,
  MERRIAM-WEBSTER ONLINE ..................................................................................................................4

*Legal Interest*,
  MERRIAM-WEBSTER'S DICTIONARY OF LAW (1996) ................................................................................4

*Prior*,
  Webster's Ninth New Collegiate Dictionary (9th ed. 1983) ...................................................................10

*Public Interest*,
  BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................................................................ 4, 5

*Release*,
  Webster's Ninth New Collegiate Dictionary (9th ed. 1983) ...................................................................10

U.S. Sentencing Manual § 3D1.4 .............................................................................................................7

To facilitate the transfer of prisoners from the federal government to a state, Congress in 1984 replaced the old common law rule of comity with a statute, 18 U.S.C. § 3623. Critical here, the key change from the common law is the congressional insistence that transfers in the public interest "shall" occur—not "may," not "might," not "could someday." As explained below, the tools of statutory construction favor Plaintiffs' interpretation of the public interest, and they further favor a reading of the statute that requires transfer upon satisfaction of the listed statutory criteria. A reading of the statute that allows Defendants to either (1) avoid the clear legal meaning of the public interest in this context, or (2) circumvent the statute by withholding transfer until the (unknowable) last 90 days of a life sentence, would eviscerate the statutory scheme by voiding all limits on Defendants' authority. In short, their proffered interpretations are a clear attempt to nullify the statute, return to the common law, and protect the murderer of Mary Bowles and Jerald Thurman from facing justice. Because Congress has waived jurisdiction over inmates when the public interest requires transfer, the executive officials' attempt to return to common law comity rules is an *ultra vires* act that should be enjoined.

## I. Background and statutory text

Relevant here, Plaintiffs brought this lawsuit seeking to enforce the plain and simple language of 18 U.S.C. § 3623 through an *ultra vires* action. Entitled "Transfer of a prisoner to State authority," and enacted by Congress in 1984, Section 3623 states as follows:

> The Director of the Bureau of Prisons shall order that a prisoner who has been charged in an indictment or information with, or convicted of, a State felony, be transferred to an official detention facility within such State prior to his release from a Federal prison facility if—
>
> (1) the transfer has been requested by the Governor or other executive authority of the State;
>
> (2) the State has presented to the Director a certified copy of the indictment, information, or judgment of conviction; and
>
> (3) the Director finds that the transfer would be in the public interest.

1

> If more than one request is presented with respect to a prisoner, the Director shall determine which request should receive preference. The expenses of such transfer shall be borne by the State requesting the transfer.

In their initial response, Defendants claimed that Congress's invocation of the "public interest" in Section 3623(3) was virtually meaningless because the phrase has "no objective standards." Defs' Br. at 13. On top of that, they claimed that Plaintiffs were overreacting because "no [Bureau of Prisons ("BOP")] decisionmaker has referenced the death penalty in connection with the requested transfer," Defs' Br. at 19, even though Defendant Tellez expressly stated that Hanson's "transfer to state authorities *for state execution* is not in the public interest," Doc. 1-3 (emphasis added). They also asserted that primary jurisdiction entitles them to keep Hanson perpetually because the statute does not say, expressly, when prior to his release the transfer must occur. *See* Defs' Br. at 16.

This Court was not persuaded "that the 'public interest' is so broad a term that it lacks any objective standards by which this Court could review the BOP Director's transfer decision." Order at 7. Rather, this Court ordered the parties, in supplemental briefs, to engage in actual statutory construction on the meaning of "public interest" and "the meaning and associated timeline (if any) of transfer 'prior to his release.'"

In briefing those two terms, Plaintiffs assume that the mandatory/permissive canon applies because of the use of the word "shall" in the statute. *See* Pls' Br. at 7 *(citing Alabama v. Bozeman*, 533 U.S. 146, 153 (2001); *Knapp v. U.S. Dep't. of Agric.*, 796 F.3d 445, 466 (5th Cir. 2015) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Because the BOP *"may"* release prisoners under the temporary release statute, 18 U.S.C. § 3622, but "shall" release prisoners under the transfer statute, *id.* § 3623, Plaintiffs assert for the reasons stated below that any interpretation of the term "public interest" and the phrase "prior to his release" must acknowledge that Congress intended any discretion in § 3623 to be substantially restricted.

2

## II. The "public interest" has a defined legal meaning: it favors timely administration of a properly issued sentence of death to a convicted murderer.

In analyzing whether an agency official's determination of the "public interest" is *ultra vires*, the Fifth Circuit considers whether the official's exercise of discretion was "rational and connected to the statutory scheme." *Jean v. Gonzales*, 452 F.3d 392, 397 (5th Cir. 2006). And in the context of the death penalty, the phrase "public interest" has a well-established meaning. Accordingly, Congress's deliberate decision to use the term public interest here prevents any official's determination that avoids capital punishment. Because the statute's ministerial entrustment to the Director to "find[] that the transfer would be in the public interest" is not wholesale discretion to rewrite the legal meaning of "public interest," the determination offered here by Defendants simply cannot be "rational and connected to the statutory scheme."

The tools of statutory construction confirm that the public interest requires transfer here. *First*, dictionaries and case law confirm the public interest in capital punishment is the timely completion of that punishment—*not* the wholesale avoidance of it. *Second*, examining the public interest in criminal punishment writ large confirms that the public interest must be interpreted in a manner that leads to the punishment for all valid convictions being carried out—*not* in a manner that leads to a valid sentence for a heinous murder being nullified entirely. *Third*, examining the statutory scheme in context confirms that the statute is designed to facilitate and encourage transfers—*not* frustrate them. Defendants cannot rationally contradict the results of these tools.

### A. *The public interest in capital punishment is well-established.*

In statutory interpretation, courts "begin, as always, with the text of the statute." *United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022). Absent a statutory definition, courts search for the plain meaning or ordinary meaning of the text—the ordinary meaning canon. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242–43 (5th Cir. 2022). "Ordinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 574 U.S. 528, 537 (2015). And when confronted with a legal term of

3

art, courts refer to legal dictionaries to define the term. *See F.A.A. v. Cooper*, 566 U.S. 284, 291–92 (2012).

Merriam-Webster confirms that the "public interest" is a legal term of art, listing the term under its "legal definition" section. *See Interest, Legal Definition*, MERRIAM-WEBSTER ONLINE.[1] That dictionary defines "public interest" as "the general welfare and rights of the public that are to be recognized, protected, and advanced." *Id.*; *see also, e.g.*, *Legal Interest*, MERRIAM-WEBSTER'S DICTIONARY OF LAW (1996). Black's Law Dictionary is also a classic reference for legal terms of art. *See, e.g., Cooper*, 566 U.S. at 292. That dictionary, in turn, provides two further potential definitions for "public interest": "[t]he general welfare of a populace considered as warranting recognition and protection" or "[s]omething in which the public as a whole has a stake; esp., an interest that justifies governmental regulation." *Public Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Nothing in any of those definitions indicates in any way—or could possibly be used to justify—an interpretation of the public interest that results in the nullification of a validly imposed sentence imposed upon a person who has violated laws prohibiting murder, *i.e.*, the most foundational laws that exist to protect the public. Rather, the general welfare of the populace has long been defined in a specific manner *favoring* capital punishment. Indeed, the U.S. Supreme Court and the Fifth Circuit have held that the public interest prioritizes the *timely* completion of death sentences. *See, e.g., United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020). Put another way, "the public interest" includes "[p]rotecting against abusive delay" in the completion of death sentences. *See Ochoa v. Collier*, 802 F. App'x 101, 106 (5th Cir. 2020) (unpublished) (quoting *Martel v. Clair*, 565 U.S. 648, 662 (2012)); *cf. Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) (the public interest favors injunctions that can occur "without delaying or impeding [an] execution").

---

[1] https://www.merriam-webster.com/dictionary/interest#legalDictionary.

4

Part of the rationale for this strong and straightforward public interest comes from the jury's findings of aggravating factors necessitating the death penalty,[2] which are findings made on behalf of the public to serve its interests in adequate punishment of heinous crimes and prevention of future murders. *See, e.g.*, *Draughon v. Dretke*, No. 02CV1679, 2005 WL 3591008, at *2 (S.D. Tex. Dec. 30, 2005) (staying the release of a death row inmate based in part on jury findings regarding future dangerousness). As one former Supreme Court justice put it, "[d]elay in the execution of judgments imposing the death penalty frustrates the public interest in deterrence." *Gomez v. Fierro*, 519 U.S. 918, 918 (1996) (Stevens, J., dissenting). As a result, the public's interest in timely enforcement of the death penalty, "to have such proceedings reach a conclusion," is a "*compelling* interest"—not just a legitimate or important one—because delay eviscerates deterrence. *Rhoades v. Reinke*, 830 F. Supp. 2d 1046, 1049, 1071 (D. Idaho 2011) (emphasis added). Again, "[f]inality is essential to both the retributive and the deterrent functions of criminal law." *Calderon v. Thompson*, 523 U.S. 538, 555 (1998). As a result, after direct appeal and post-conviction remedies are exhausted, any *de facto* commutation of a death sentence to life imprisonment that is outside the bounds of enacted law and procedure is indisputably contrary to the public interest because of the profound injury it inflicts on the public's ability to punish criminals and discourage future crimes. *Id.* at 556; *Bowles v. Desantis*, 934 F.3d 1230, 1248 (11th Cir. 2019).

Accordingly, in the context of a parallel federal and state conviction and sentence, the public interest is a legal term of art meaning the "protection" of the "general welfare of a populace," *Public Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019), through a result that ensures the timely completion of any death sentence in the equation, whether it be on the federal side or the state side. (If the roles were reversed here, and a state was refusing to turn a prisoner over to the federal government for a

---

[2] Of note here, the jury determination for the sentence for Mary Bowles's murder included Hanson's participation in Jerald Thurman's murder and the entirety of the evidence surrounding the murders.

5

validly imposed execution, this too would violate the public interest. Whether it would be actionable under a given statute is a different question.) Under this definition, Director Tellez's decision to deny "transfer to state authorities for state execution," Doc. 1-3, unlawfully *opposes* the public interest in adequate punishment for the murder of Mary Bowles and in the timely completion of a death sentence.

### B. More broadly, the public interest in punishment of all crimes is also well-established.

Stepping back a bit, it is important to understand that the public interest also favors punishment for all crimes committed. In the context of criminal convictions generally, the public's interest is protecting the welfare of the populace through the adequate punishment of crime—"the public interest in insuring that justice is meted out to offenders" *United States v. Scott*, 437 U.S. 82, 92 (1978). Our criminal justice system operates on the baseline and fundamental presumption that prosecutors seek convictions on crimes that harm the public interest. *See United States v. Salinas*, 693 F.2d 348, 351–352 (5th Cir. 1982). As a result, our system also presumes that all valid convictions are in the public interest because these convictions effectuate the "compelling public interest in punishing crimes." *Garrett v. United States*, 471 U.S. 773, 796 (1985) (O'Connor, J., concurring).

The public interest thus demands that "a prisoner is not entitled to escape punishment for a valid conviction." *United States v. Olarte-Morales*, 992 F.2d 1223 (10th Cir. 1993) (unpublished). Sentences are regularly corrected on appeal to ensure that the proper amount of punishment is administered. *Bozza v. United States*, 330 U.S. 160, 166–167 (1947); *see also Llerena v. United States*, 508 F.2d 78, 81 (5th Cir. 1975) ("[w]hen the sentencing court discovers that a sentence imposed by it did not conform to the applicable penalty statute, it has the duty to correct the sentence so as to comply with the statute even though . . . the corrected sentence is required to be more onerous"). When properly done, federal sentences also prioritize punishment of severe crimes under the assumption that such punishment will also fulfill some lesser sentences. *See, e.g.*, U.S. Sentencing Manual § 3D1.4 (prioritizing the "highest offense level" when calculating a federal sentence for multiple crimes).

The core public interest underlying all these various principles is that valid convictions should always result in actual punishment. Indeed, the Fifth Circuit has repeatedly stressed that enforcement of criminal laws is in the public interest. *See, e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). Thus, prioritizing lesser crimes in a manner that prevents the State from carrying out its sentence for murder is against the public interest.

Here, the public interest in punishing all crimes is only carried out if transfer occurs. The federal interest in making sure the inmate stays in custody until the end of his life is not in jeopardy, whether Hanson is transferred or not. The State is assuredly not seeking to take charge of the inmate in order to release him, but rather to further punish him, so Hanson would not escape punishment for his robbery through transfer. On the other hand, allowing the prisoner to remain in federal custody directly thwarts the public interest in punishing all crimes by allowing Hanson to escape punishment for his brutal murder of Bowles. To find that a life sentence must precede a State death sentence would not only deny transfer but also lead to the conclusion that Hanson's life sentence for the murder of Jerald Thurman takes precedence over the death sentence for the murder of Mary Bowles even if the State had custody, an irrational and indefensible hierarchy. As a result, whereas transfer would result in adequate punishment for both the federal and state convictions, the denial of transfer directly assists a prisoner in escaping punishment for one of his murders, which undermines the public interest in punishing all convicted crimes.

### C.   *The statutory scheme was designed to facilitate transfers, not thwart them.*

In addition to the well-understood public interest in timely enforcement of the death penalty and in punishment of all crimes, the statutory scheme here provides further indication that transfers to state custody are in the public interest. When interpreting a statute, courts "follow the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it." *Knapp*, 796 F.3d at 466 (quoting *Hibbs*, 542 U.S. at 101). To start, the subject of the statute

7

is facilitating transfers of inmates under federal sentences—prisoners under the purview of the BOP Director—to state custody to fulfill a state conviction and sentence. *See* 18 U.S.C. § 3623.[3] Thus, the statute presumes, and expressly states, that the surrender of a federal right to punish certain defendants *shall* occur.

Moreover, courts may examine "[t]he title of a statute and the heading of a section" in determining the meaning of a statutory provision—the title-and-headings canon. *Yates*, 574 at 540. The transfer statute, again, is entitled "Transfer of a prisoner to State authority," 18 U.S.C. § 3623, the subsection containing that statute is entitled "Imprisonment," 18 U.S.C. Subchapter C, and the section containing that statute is entitled "Postsentence Administration." 18 U.S.C. Chapter 229. The chapter and subchapter headings confirm that the context is the disposition of convicted and sentenced federal prisoners, and the statute title confirms that the context is the disposition of those prisoners when the State has some claim to authority over them. Likewise, because the statute speaks of transfers *to* another authority, it assumes application when the federal government has primary jurisdiction such that the inmate is in federal custody. Accordingly, the statute addresses when the federal government "shall" yield its primary jurisdiction and its federal sentence to state custody to fulfill some other sentence under a different context. And the straightforward phrasing of the title strongly indicates that the presumption lies in favor of the transfer, not in favor of retention.

It is apparent from the statutory scheme, then, that Congress has determined that transfers from federal to state custody are necessary to prioritize the public interest in certain punishments *over* the federal interest in retaining particular inmates. This interpretation aligns with the general constitutional structure that considers states the primary sovereign in criminal matters. *Shinn v. Ramirez*, 142 S. Ct. 1718, 1730–31 (2022) ("[T]he States possess primary authority for defining and enforcing

---

[3] The statute speaks of indictments or informations as well, but because Plaintiffs are only asserting a conviction, the State conviction is the relevant statutory context here.

the criminal law." (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (2022)))). This interpretation also confirms that Congress supplanted the common law with a statute in order to accomplish a particular goal. To adopt Defendants' view, however, is to supplant the statute with Defendants' preference to protect a murderer that is contrary to the public interest.

### D. Contradicting the plain meaning of the statute cannot be rational or connected to the statutory scheme.

Defendants' decision here is neither rational nor connected to the statutory scheme because it directly contradicts a clear requirement in the statute. As the Fifth Circuit has explained, an official's decision is "rational and connected to the statutory scheme" if it "did not exceed the discretionary authority afforded to him by Congress." *Perez Pimentel v. Mukasey*, 530 F.3d 321, 325–326 (5th Cir. 2008). The transfer statute commands that transfer "shall" occur whenever its three criteria are satisfied. *See* 18 U.S.C. § 3623. Because Plaintiffs and Defendants agree that the federal government has unrestricted comity authority to transfer when it wants to transfer, the statute's "shall" command only has meaning if the criteria compel a transfer outside the typical comity rules. Defendants cannot reasonably dispute the enactment of the statute replaced the common law where transfers were within the unfettered comity discretion of the Attorney General. *See* Compl. ¶¶ 21–23 (citing, among others, *Ponzi v. Fessenden*, 258 U.S. 254, 261–62 (1922)). Instead of stating that transfers would continue as a matter of comity, or as a matter of pure discretion, Congress limited that discretion by saying that transfers in the public interest "shall" take place. 18 U.S.C. § 3623.

There is only one key difference between the statutory scheme and the old common law rule: the statute constrains BOP actions to the public interest. Any other reading of the statutory scheme renders it a nullity and allows BOP to expand its power and set aside a statute at whim. By disregarding the public interest as defined by the tools of statutory construction, Defendants seek to exceed a clear and straightforward limit that Congress has placed on their discretionary authority. Accordingly, their

9

action openly violates the statutory scheme the Congress has put in place in favor of the pre-statutory system, is *ultra vires*, and must be enjoined for irrational violation of statutory limits.

### III. The term "prior to his release" is only a description of when the statute applies, not a power to frustrate or deny transfers commanded by the statute.

The tools of statutory construction also confirm that the phrase "prior to his release" supports transfer here. At the outset, the meaning of the phrase "prior to his release" absent context is likely undisputed. The word "prior" means "earlier in time or order." *Prior*, Merriam-Webster Online;[4] *see also, e.g.*, *Prior*, Webster's Ninth New Collegiate Dictionary (9th ed. 1983). The word "release" means "to set free from restraint, confinement, or servitude." *Release*, Merriam-Webster Online;[5] *see also, e.g.*, *Release*, Webster's Ninth New Collegiate Dictionary (9th ed. 1983). Combining those two terms, the phrase "prior to his release" plainly refers to an action that occurs earlier in time than when the inmate at issue is set free from federal confinement.

The dispute concerns how to read this phrase in context. Examining the full statute and the broader section in the U.S. Code helps clarify the meaning of the phrase. *See Calogero v. Shows, Cali & Walsh L.L.P.*, 970 F.3d 576, 584–85 (5th Cir. 2020). To begin, the full text of the statute indicates that the phrase "prior to his release" refers to when the statutory criteria apply and is not a loophole around them. *See* 18 U.S.C. § 3623. The statute has two parts that are relevant here: a prefatory phrase, and a list of criteria. The prefatory phrase commands that BOP *shall* transfer "prior to his release" "if" certain conditions are met. The list of criteria provides the conditions on which the "shall" command applies, with references to "*the* transfer" that indicate the criteria assess a particular request. *See id.* Once the "shall" command attaches to a request for transfer prior to release, BOP cannot wriggle out of the public interest in a particular transfer by using the prefatory paragraph to ignore the terms of the actual transfer request on review. That is to say, if a state asks for a transfer so that a punishment

---

[4] https://www.merriam-webster.com/dictionary/prior
[5] https://www.merriam-webster.com/dictionary/release

can be carried out at a certain time or in a certain time period, and the criteria in the statute are otherwise met, the Director clearly violates the statute and its use of the word "shall" if he decides to delay the transfer in such a way that the punishment cannot be carried out—even if the delay is still technically "prior to release." To hold otherwise, as Plaintiffs have already argued, would, in this context, mean that Defendants do not have to follow the statute at all, since they could claim that any "release" of a person with a life sentence is always in the future. To render the entire statute nugatory cannot be the appropriate textual approach.

The reference to the public interest confirms that the statute's criteria are applied to a particular request at the time the request is made. The third criterion assesses whether the requested transfer is in the public interest — "*the* transfer," not any transfer. *See* 18 U.S.C. § 3623(3) (emphasis added). Because the public interest analysis is focused on a particular request, not any hypothetical transfer that might be sought in the future, the analysis must consider whether the request is currently in the public interest. Indeed, it would be infeasible for Defendants to assess the public interest for all potential future times of transfer that could occur prior to release. Therefore, if the transfer is requested prior to release and the criteria are all met at the time of request, the prisoner "shall" be transferred in the immediate here and now.

Once again, any contrary reading would render the other statutory requirements superfluous, with no meaning in this context. *See* Pls. Reply at 5-6. Under the surplusage canon, "[i]t is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001). As it stands, Defendants' view the statute as permitting them to delay a transfer that meets all three criteria until one day prior to release. Defs. Br. at 16-17. After all, the statute only says "prior to release," and the day before release technically satisfies that criteria. Under that reading, a request from an executive

11

officer attaching a certified judgment under § 3623 requires almost nothing additional from the BOP than a detainer from a state staff member. The result would be that a transfer that satisfies all criteria, including the public interest, could still be delayed in prejudice to the public interest for 20 years, 30 years, 40 years, or even longer under the statute. This result would particularly void the statute in the context of a life sentence, where there is no release date at issue, rendering any grant of a transfer "90 days prior to release" meaningless. Permitting executive officials to indefinitely delay transfer would strip most of the statute of any meaning or purpose, rendering the criteria largely a pointless exercise and violating the surplusage canon.

The BOP's program statement about preferring transfers 90 days prior to release does not save their decision from being *ultra vires*. For one thing, Defendants flatly denied a transfer here. No Defendant has stated that the criteria were met but that the 90-day policy precludes them from transferring inmate Hanson now. Director Tellez cited the 90-day approach as what he would "[o]rdinarily" do, but he denied a transfer instead of granting or promising to grant a transfer within that timeframe. *See* Doc. 1-3. If anything, Director Tellez's decision actually indicates that a finding that the transfer was in the public interest would have required an immediate transfer, which is consistent with *Plaintiffs'* reading of the statute.

Additionally, the BOP does not have authority to modify statutory requirements. There is no express statutory provision authorizing them to promulgate rules for the transfer. Even if there were some basis for such a 90-day rule, their interpretation could not be considered valid unless it was a permissible and reasonable construction of the statute. *See, e.g.*, *Reno v. Koray*, 515 U.S. 50, 61 (1995) (noting BOP program statement must be a permissible construction of the statute to receive any deference). If the statute truly means that transfers can be delayed until one day before release, as Defendants suggest, then the program statement about some 90-day term cannot be a statutory interpretation because it has no basis in the statute. They cannot alter the timing by regulation because

of the canon *casus omissus pro omisso habendus est*—"a statute should not be read to include matter it does not include." *Env't Integrity Project v. U.S. Env't Prot. Agency*, 969 F.3d 529, 541 (5th Cir. 2020). Put another way, "[n]othing is to be added to what the text states or reasonably implies." *Williams v. Lakeview Loan Servicing LLC*, 509 F. Supp. 3d 676, 680 (S.D. Tex. 2020) (quoting Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (West 2012)).

The program statement Defendants cite here is not a permissible construction because there is no statutory support for a 90-day rule that would apply without regard to the public interest. *See Thompson v. Goetzmann*, 337 F.3d 489, 501–02 (5th Cir. 2003) (assuming regulations interpreted a statutory term, the regulations must be rejected where there is no statutory support for the proffered definition). Such an approach would undermine the statutory structure, not interpret it, and "regulations can't punch holes in the rules Congress has laid down." *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022). Accordingly, the BOP's program statement is no basis to reject the plain meaning of the statute in context.

In sum, the phrase "prior to his release" is merely descriptive of when the transfer requests subject to the "shall" command take place, and then the three criteria are applied to "the transfer" requested in order to assess whether the transfer is mandatory *at the time requested*. The request here sought transfer prior to Hanson's release, and as a result, it is subject to the three criteria and must be granted on its particular terms if it satisfies those criteria. Because it satisfies the criteria, *see supra* Part I, compliance with the timely transfer request is mandatory. There is no statutory loophole around the clear meaning of the text requiring transfers in the public interest.

13

December 2, 2022                                Respectfully submitted,

                                              */s/ Bryan Cleveland*
John C. Sullivan
S|L LAW PLLC
Texas Bar Number: 24083920
610 Uptown Blvd., Suite 2000
Cedar Hill, TX 75104
Phone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

Bryan Cleveland
  *Chief, Reserved Powers Protection Unit*
Will Flanagan
  *Assistant Solicitor General*
OKLAHOMA ATTORNEY GENERAL'S OFFICE
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
bryan.cleveland@oag.ok.gov

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that the undersigned document was served on all parties who have appeared in the case electronically via ECF on December 2, 2022, or by another manner authorized by Fed. R. Civ. P. 5(b)(2).

*/s/ Bryan Cleveland*
Bryan Cleveland